### STANDARD COMPUTING SCALE CO. v. COMPUTING SCALE CO.

(Circuit Court of Appeals, Sixth Circuit. November 20, 1903.)

#### No. 1,211.

1. PATENTS—INFRINGEMENT—IDENTITY OF PRINCIPLE OF OPERATION.
    A structure may be within the terms of the claims of a patent and still not an infringement, unless the principle of the two devices is substantially identical.

2. SAME—COMPUTING SCALES.
    The Pitrat patent, No. 385,005, for improvements in weighing and price scales, of the type in which the connecting rod between the platform and the price-indicating member of the beam, including the head-block, remains stationary, while the beam is moved laterally through the head-block, when limited, as it must be to sustain its validity in view of the prior art, to the specific construction shown, is not infringed by scales of the type in which the beam is retained rigidly in place while the head-block and connecting rod are shifted laterally to reach the proper place on the price-beam. The Ozias patent, No. 316,348, the Sanderson and Ozias patent, No. 451,075, and the Culmer patent, No. 486,663, all for improvements on computing scales of the same type as that of the Pitrat patent, construed and *held* not infringed. The Mellinger reissued patent, No. 11,738, also for improvements in scales of the same character, *held* void for anticipation as to claims 1 and 4, and not infringed as to claims 2, 9, 10, and 11.

3. SAME—CONTRIBUTORY INFRINGEMENT.
    One who makes and sells a machine having peculiar provision for the intended incorporation therein of a valid patented device is liable as a contributory infringer, if the expected incorporation is thereafter made by another; but, if his machine is equally adapted to the use of other devices known to the art, he is not liable, if another of his own volition incorporates that of the patent.

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

The appellant brought suit upon a bill in equity to restrain the appellee from interfering with and injuring its business by publishing allegations charging the infringement of patents belonging to the appellee, and charging other unlawful proceedings of the appellant detrimental to its trade. The appellee appeared and answered, denying all wrongdoing on its part, and alleging the fact to be that the appellant was infringing certain patents belonging to it, and thereupon filed its cross-bill with similar allegations and charges, in which it prayed for affirmative relief by injunction, and a decree for profits and damages. The appellant answered, denying the validity of the appel-

lee's patents in part, and also denying generally infringement of said patents. The usual replication was filed to this answer. It would seem that by common consent the pleadings in the original suit have dropped out of consideration, and the controversy has been waged on the matters of the cross-bill and the answer thereto. The patents claimed by the appellee, and with the infringement of which the appellant was charged, were five in number. Twenty-two of the claims thereof are here involved. At the hearing upon pleadings and proofs the Circuit Court decreed all these claims to be valid and all infringed. An injunction was awarded, and a reference ordered for the ascertainment of the profits and damages. Defendant in the cross-bill has appealed.

C. H. Fisk, for appellant.
Paul A. Staley and Border Bowman, for appellee.

Before LURTON and SEVERENS, Circuit Judges, and COCHRAN, District Judge.

SEVERENS, Circuit Judge, having given the foregoing outline of the case, delivered the opinion of the court.

The appellant is charged with the infringement of the following patents: A patent to J. A. Pitrat, No. 385,005, issued June 26, 1888; a patent to Ozias, No. 316,348, issued December 20, 1898; a patent to Sanderson & Ozias, No. 451,075, issued April 28, 1891; a patent to Culmer, No. 486,663, issued November 23, 1892; and a patent to Mellinger, No. 11,738, reissued May 2, 1899. All of these patents were for improvements in "weighing and price scales," more commonly called "computing scales," the special purpose of which is to ascertain the whole price of the thing bought or sold, without any computation by the person using it; the whole price being designated by the scale itself when manipulated. The utility of these scales consists in the certainty and readiness by which the total price is ascertained. The essential principle on which they rest is the variation of the leverage on the beam given to the load which is the subject of the operation; the extent of the leverage being governed by the price per pound or other unit, suitable graduations being marked on the short arm of the beam, and corresponding graduations on the opposite arm of the beam beyond the pivot.

The first patent granted for scales of this kind shown in the record was one to Tilly and Warren Flint, issued March 20, 1849, a patent to which we shall have occasion to refer hereafter. Several patents were subsequently granted for various improvements in organization, but depending upon the same general principle. Among these, three patents had been issued to Pitrat prior to the one here in question, the first bearing date March 31, 1885. To some of these we shall also refer later on. In the early patent to the Flints the thing to be weighed or estimated was suspended on a pan by a connecting rod running up to the short arm of the lever or beam, and there pivoted to the lower end of the loop or knife-edged saddle, the lower edge of the upper portion of the loop resting in the notches on the lever which marked its graduation. Later on the scheme was transferred to platform scales in which the platform and its supports took the place of the pan. In one form of platform computing scales (the one to which the appellee's patents relate) the connecting rod (in-

cluding the head-block between the platform and the price-indicating member of the beam did not move laterally—indeed, pains were taken to prevent such motion—but the beam was moved through the head-block to reach the proper place on that arm to designate the price per unit.   This was the adjustment.

The other organization, to which class the appellant's scale belongs, retains the beam, the pivot, and their supports rigidly in place; and the connecting rod (or the parts which perform its office) and the head-block are shifted laterally to reach the proper place for the head-block on the price-beam.   The details of construction of the two forms vary to suit the differing requirements.   Recognizing these differences and the obvious difference in their mode of operation, we were led to remark upon them in a former suit between the same parties (118 Fed. 965, 55 C. C. A. 459), where the question was whether one form would be likely to be taken for the other by the public; and the marked mechanical difference was one of the grounds upon which we held that such mistake was not likely.

The patent having the most extensive scope of those in suit is the Pitrat patent, No. 385,005.   It was the fourth of those issued to him, and was granted for "certain new and useful improvements in weighing and price scales" which he claimed to have invented, having the following objects:  To take off from the platform levers the load of the beams and weights required in this kind of scale, to adapt the platform to use either with or without a scoop, and to provide means for holding the connecting rod in a fixed position while the beam is shifted through it, and simultaneously effecting such shifting of the beam.   Only the first and last of these objects are here involved.   Figure 2, here shown, is a front view of the scale.

Figure 10 shows the platform levers and the counterbalancing lever and poise designed to take off the weight of the platform levers and other parts employed in the operation of the scale.

In Fig. 2 there is seen a sub-base, h, resting on two pillars. The connecting rod passes from the platform levers up through the left hand pillar to the head-block resting on the lower beam. The base, i, which carries the supports of the beam, is moved on the sub-base either to right or left by means of a pinion set on a shaft extending back from the thumb-piece, U, and meshing with cogs set lengthwise of the bottom of the base. By turning the thumb-piece, U, the beam is carried through the head-block at the upper end of the connecting-rod until the head-block reaches the proper distance on the lower arm of the beam from the pivot, o, to indicate the price per unit. Simultaneously with this movement of the thumb-piece and shaft, the latter is pushed back against a spring until it engages the lower arm of a lever, V, which, turning back on its pivots, $v'$ $v'$, engages the head-block by a pin at its upper end which enters the slot, $g^2$, in the head-block. By this means the head-block, and of course the connecting rod, are held in rigid relation to the sub-base while the beam is adjusted through the former to the right or left.

In Fig. 10, b is the counterbalancing lever and C is the poise. This lever is pivotally connected at e with the platform levers and the lower end of the connecting rod so as to neutralize the weight of those parts and the parts above directly associated therewith. The combination of this counterbalancing lever with the other enumerated parts constitutes the substance of the first claim, which reads as follows:

"The combination, with the platform levers and the price-beam, of the head-block, and the connecting rod interposed between and connecting the platform levers directly with the head-block of the price-beam, substantially as and for the purpose described."

The patentee, after mentioning the platform levers, a and a', which are ordinary platform levers, says:

"In addition to the said levers (and unlike any of the other platform scales), I provide an extra lever, b, carrying a weight, C, at the one end, while the opposite end engages pivotally with the rod, e, which connects the lower lev-

ers, aa', with the left branch of price-beam, K, above. The object of this weighted lever, b, is to act as a counterpoise to levers a a', the platform A', the removable lid, y, the connecting rod, e, and the cross-head or block, g."

And we think the weighted lever, b, was intended to be included in this claim as one of the "platform levers."

The appellant's scale has means for counterbalancing similar parts of its structure. The appellee, in order to maintain the charge of infringement, claims for its patent that, though not a pioneer, it is one of a broad and fundamental character, having limitations wide enough to include generally any means operating to effect a similar purpose. At least, it is necessary to attribute to its patent a scope substantially as broad as this in order to establish the charge of infringement of this patent. But, although we do not deny to it the merit of invention, it is impossible to recognize in it any such scope as is claimed for it. It was as old as anything in this art to provide means for counterbalancing the weight of those parts of the structure which rested upon the price-beam. In the Flint patent of 1849 this was done by a lever and poise which lifted those parts by attachment at the upper end of the connecting rod. In the Allen patent of 1871 means were provided to counterpoise the same parts by a lever and weight. And in a patent to Pitrat himself, of March 31, 1885, the fixed load was counterbalanced by a poise and lever. And it would seem to have been a great desideratum, if not a necessity, for accurate work, that this fixed load should in some way be neutralized. It is true that in some of the previous patents, where this point was attended to, there was a suspended pan instead of a platform; but the transference of the same means to operate in a platform scale was not invention, and it is impossible to hold that Pitrat, by putting these old means into the patent in suit, could preclude all others from the use of such means in the scales in which they might wish to employ them. To give such effect to the claim in question would make it so broad that it could not stand in the face of the prior art. It can only be supported for the specific construction pointed out by the patentee, namely, for a counterbalancing beam and poise combined and in connection with the platform levers and the connecting rod. So construed, it is not contended that the claim is infringed. It may well be that putting this part in a secure place and out of the way might merit a patent. Such facts were held by us in Star Brass Works v. General Electric Co., 111 Fed. 398, 49 C. C. A. 409, to be worthy of recognition. In the defendant's scale, the similar parts are counterpoised by an adjunct which serves also as a tare-beam in the elevated parts of the scale.

The other claims of this patent which are alleged to be infringed are the fourth, seventh, and tenth, as follows:

"(4) The combination, with the price-beam and the head-block having a vertical slot, of the retaining lever and engager carried thereby and adapted to enter the slot, substantially as and for the purpose described."

"(7) The combination, with the sub-base, the price-beam mounted on a base and the head-block, of the retaining lever having lateral projections between its ends, the uprights, and the pivotal supports, substantially as and for the purpose described."

"(10) The combination, with the platform levers, the price-beam, the base carrying the price-beam, and the head-block provided with the index or pointer, of the rod connecting the head-block and the said platform levers and the retaining lever, substantially as and for the purpose described."

These several claims all include the "engager," which is designed to hold fast in its place the head-block while the beam is shifted through it, in combination with other parts not new except that the tenth takes in the price-beam shown on the base in Fig. 2, a feature which it is not necessary for us to consider, in view of our opinion in respect to the scope to be given to the device called the "engager." The seventh claim involves a modified form of the engager, in which the upper end is divided and embraces the sides of the head-block. With respect to these claims it is again urged that the patent is entitled to the broad construction contended for in construing the first claim, and we are asked, in effect, to accord to this device such effect as shall exclude all other means for holding the head-block in place while the beam is being adjusted. This we should have to do in order to find infringement. But other conditions than those recited exist. The engager in the appellee's patent has for its only purpose that of a detent holding the head-block in a constantly fixed perpendicular relation to the constantly perpendicular connecting rod. It fits the requirements of the class of computing scales in which it was intended to be used. It would have no adaptation to a scale in which the head-block is designed to be constantly moving laterally. What the appellee points out in the other party's scale as an equivalent of its engager is a finger which is pressed up into an opening in the bottom of the head-block and presses it up against springs in its upper part which normally press down a notched member of the head-block into notches on the beam. Without going into more detail, it is sufficient to say that this pressure upward of the finger into the head-block performs the function of relieving the head-block from its normal grip upon the beam while it is being moved along it to its place at the price mark for the unit of weight. We think it not too much to say that this device bears no resemblance to the engager of the appellee's patent, and, since it has no such function, it cannot be that a combination including it operates in the same way as the combination of the appellee which includes, as an efficient and characteristic element, its engager. This conclusion renders it unnecessary to make further comparison. It follows that we do not find these claims to have been infringed. We may repeat what we said of the first claim, that we do not raise any question of the patentability of these claims. But we think that for the reasons stated they are of narrow compass, and that they are not infringed.

The patent to Ozias, No. 316,348, was for improvements in such scales, the object of which he states to be to improve the detailed construction of the parts, so that they shall be less liable to be disarranged or worn and thereby become inoperative. The claims here involved, the fourth, fifth, and sixth, relate to the head-block and the means for supporting it during adjustment on the beam, and particularly to the inclusion in specified combinations of a roller inside the head-block bearing against the under side of the beam, and, in one

of the claims, "spring-pressed," to facilitate the movement of the beam through the head-block without friction, and means—not specified in the fourth claim, but called "stop-rests" in the fifth and sixth —for supporting the head-block independent of the platform connections. These claims read as follows:

"(4) In a price-indicating scale the combination with a relatively movable price-beam and the head-block and connections between said head-block and platform, and an anti-friction roller mounted in the head-block and bearing against the under edge of the beam, whereby a rolling contact or point of support is afforded during the relative movements of the parts, with means for supporting the head-block independent of the platform connections, substantially as described.

"(5) In a price-indicating scale, the combination with the relatively movable price-beam and head-block and connections between said head-block and platform, and an anti-friction roller mounted in the head-block and bearing against the under edge of the beam, and a stop-rest independent of the platform connections for supporting said head-block during the relative movements of the head-block and beam, substantially as described.

"(6) In a price-indicating scale, the combination with the relatively movable price-beam and head-block and connections between said head-block and platform, of a spring-pressed anti-friction roller, mounted in the head-block, and co-operating with the under edge of the beam, and the stop-rests for supporting said head-block, substantially as described."

It is seen that the new elements are the roller which the patentee says bears against the under side of the beam and the stop-rests, independent of the platform connections. But the roller, whether with or without spring pressure, was no new thing in such head-blocks, and was shown in several previous patents; for instance, in the patent to Swihart, 1893, No. 490,518; the patent to Fisher, 1896, No. 557,064; and the patent to Culmer, 1896, No. 552,826. In some the rollers engaged the upper edge of the beam, and in some the lower, and in the patent to Culmer, just cited, the rollers were spring-pressed. The appellant uses spring-pressed rollers; the rollers being forced up under the beam by springs in the upper part of the head-block between the head and a notched member running on the beam and meshing into the beam when the adjustment is made. To transfer a roller, with a spring to press it, from the upper part of the head-block to the lower, and vice versa, to engage the beam and relieve friction is not invention. Moreover, the appellant's structure is not appreciably different from the old art in this regard. But all of these claims include as an element stop-rests for supporting the head-block, independent of the platform connections. The only parts of the appellant's scale which would answer to the call of "stop-rests" do not operate independently of the platform connections, but are dependent upon them. The frame which serves as a connection with the platform and its levers is the indispensable medium through which the head-block is lifted by depressing the tare-beam which is pivoted to connect with it. The combinations of these claims seem to have been made with reference to their use in the Pitrat class of scales, to which they have an appropriate relation, and the appellee encounters an inherent difficulty growing out of the different mode of operation of the two classes to which we have referred. In the appellee's scales it is desirable that those parts which

engage the head-block should have connection with something else than some part of the connections with the platform. In the appellant's, it is equally important that those parts should be associated with those connections, so that they may travel together. Without going further into and comparing the details of construction, we are of opinion that this patent is not infringed.

Another patent upon which the appellee relies is the patent to Sanderson and Ozias, No. 451,075. The specification states that the invention relates to improvements in scales such as are described in the patent to Pitrat, No. 385,005, and in the application of Ozias and Canby ·on which patent No. 448,837 was subsequently issued. On reference to that application it is seen that it, too, refers to the Pitrat patent for the details of mechanical construction; and the specification further shows that Sanderson and Ozias adopt that construction as the basis of their own claims. Claims 8, 9, and 10 are alleged to be infringed. They are as follows:

"(8) In a price and weighing scale, the combination, with the shifting, computing, or price-beam and the weighing beam having a fixed fulcrum, of connections between each of said beams and the platform, substantially as described.

"(9) In a price and weighing scale, the combination, with the computing beam having a shifting fulcrum and the connecting rod loosely connected to said beam, of the independent weight or counter beam having a fixed fulcrum and an independent connection with the said rod, substantially as described.

"(10) In a price and weighing scale, the combination, with the computing beam having a shifting fulcrum and the connecting rod loosely connected therewith, of the independent weight or counter beam having a knife-edge bearing and a bearing on the rod independent of the connection between the computing beam and rod with which the knife-edge bearing engages, substantially as described."

These claims are construed by the appellee as containing the special device of employing the counterbalancing lever as a tare-beam, that is, means for weighing the tare in the common way of platform scales. While it is true that in the description this improvement is mentioned, it seems doubtful whether the eighth claim includes it; and this doubt is increased by the fact that in some of the other claims it certainly is not included, while in certain others it is. This would seem to lead to the conclusion that it is not included in the eighth. Besides, it would be difficult to read that element into the claim. The "weighing beam" seems to mean the beam on which the computing is done. If so, there is nothing to suggest the tare-beam. But the ninth and tenth claims do include it. It does not seem to have been a very abstruse invention, having the counterbalancing lever of the old art before one, to register on it the marks of a common scale to show the additional weight put upon the platform, but perhaps it may merit a patent. And if it had been separately claimed the question would be presented. But the patentees saw fit to put it into a combination which calls for the special characteristic of the Pitrat scale, that is, the computing beam having a shifting fulcrum. The drawings show that form of scale and no other; and the patentees professed, as we have said, to be improving upon that scale. But as the appellant does not use that combination, there is no infringement.

Another thing is the point, which the appellee makes, that there was no joint invention for the subject of this patent; it being contended that the claims therein were for inventions of Sanderson solely, or, if any were not, that Ozias was the inventor; and this contention seems to us well founded. The evidence is convincing that Ozias had nothing to do with the invention of many of the claims, but may have been of that feature which involves the use of the balancing lever for a tare-beam. Sanderson and Ozias at the time the application was made were going into a partnership, and it appears most probable that they conceived the idea of having the patent vest a joint interest to conform to their interest in the business. If these are the facts, the patent was not properly issued to them jointly, but each should have patented his own invention.

Claims 1, 2, 3, 4, 10, and 18 of the patent to Culmer, patent No. 486,663, are also said to be infringed. In many of the scales then in use there was a tare-beam which was used as a weighing beam; and, as Culmer stated in his application, the arc made by the short arm of this weighing beam was different from that of the price-beam, so that in operation there was some friction and liability to error; and this, he says, it was the principal object of his invention to remedy. The means which he proposed were certain special devices for flexing the connecting rod by making a joint therein between the weighing beam and the computing beam (including in that term the price-beam). The following are the claims in question:

"(1) The combination, with the computing beam and the weight-beam, of a rod connecting said beams, having a flexible joint between such connections, whereby said rod will adapt itself to the variations in the vibrations of the said beams in the efficient working of the scale, substantially as described.

"(2) The combination, with the computing and weighing beams of a weighing and price-scale, placed the one above the other, of a rod adapted to connect the weight-carrying levers with the said beams, composed of a lower and an upper part which are flexibly connected at a point between the weighing and computing beams, the said lower part having a pivot connection with the said weighing beam, substantially in the manner and for the purpose set forth.

"(3) The combination, with the computing and weighing beams of a weighing and price scale, of a rod composed of an upper and a lower part, adapted to connect the weight-carrying levers with the said beams, the upper part having pivotal connection with a link through which the computing beam slides and having its lower end flexibly jointed with the said lower part, which latter has a knife-edge bearing, 19, on the weighing beam and a limited pivotal movement relative to the said upper part, substantially as described.

"(4) In a weighing and price scale, the combination of the computing beam, a slotted link within which the said beam slides, having pivot-bearings and a weight-beam, with a rod connecting the link-pivots and the weight-beam, and having a flexible joint between such connections, and mechanism for engaging said link-pivots for lifting them out of bearing contact with said rod, substantially as described, for the purpose stated."

"(10) In a computing scale, the combination, with a computing beam and a weight-beam, of a vertical rod having a free pivotal connection with a link on said computing beam, a bearing connection on the weight-beam, a flexible joint in itself between such connections, and a pivotal connection with the platform or scale levers, whereby in the operation of the scale the difference between the fixed arc described by the weight-beam and the variable arc described by the computing beam is compensated for without friction."

"(18) In a weighing and price scale, a computing beam constructed with three separate divisions arranged in groups of determined size, substantially

as described, in combination with a slide-link, 43, and a poise, 46, the lower division forming an upper and a lower series with which the said link 43 co-acts, representing the price division A and B, the upper division representing the value series A and the intermediate division representing both the value and weight series B, the poise, 46, coacting with said upper and intermediate series, whereby the value and price of the article being weighed is determined, as described."

As the flexible connecting rod is made the characteristic element of the first five of these claims, they may conveniently be considered together. It was said of this patent by the Circuit Court of Appeals for the Third Circuit, in a case where the infringement thereof was charged, that "it is very certain that the relation of this patent to the scale-making art is not such as to entitle the claim in question [claim 1] to a construction covering devices which do not come within its specific terms. The improvements disclosed by the patents have no primary characteristics" (Computing Scale Co. v. Keystone Store Service Co., 101 Fed. 837, 42 C. C. A. 48); and we concur in that view. Fig. 2 of the drawings illustrates the construction.

Assuming these claims to be valid, we observe that the connecting rod of the patent is made of two parts, 18 and 28. The short arm of the weighing-beam is bifurcated at the end, and a pivot, 49, runs between, upon which rests the upper bearing of the rod, 18. The upper end of the rod, 18, is pivoted to the lower end of the rod, 28. This is the way in which the connecting rod is made flexible. Other details relating to the head-block and its immediate connections are shown, but are not essentially different from the former art, and need not be enumerated. By comparing this with the Sanderson and Ozias patent, it is seen that, so far as these claims are concerned, all that Culmer did was to put a joint in the connecting rod between its upper and lower parts. The appellant does not use a flexible connecting rod. The frame between the platform and the price-beam,

in so far as it serves the purpose of a connecting rod, is not flexible, and does not embody the characteristics of the Culmer patent. If with other means a kind of flexibility between the weighing beam and the computing beam is supplied, it is done by different mechanism operating in a different way. Unless we attribute to the Culmer patent a scope so wide as to include all means of effecting flexibility between the beams, the appellant does not infringe, for it would be difficult to conceive things more unlike. It may be true that the appellant's structure would meet in a general way the calls of the first claim of the Culmer patent; but, if so, it is a capital illustration of the truth of what was said by Mr. Justice Brown in delivering the opinion of the Supreme Court in Westinghouse v. Boyden Power Brake Co., 170 U. S., at page 568, 18 Sup. Ct. 722, 42 L. Ed. 1136, when he said:

"We have repeatedly held that a charge of infringement is sometimes made out, though the letter of the claims be avoided. Machine Co. v. Murphy, 97 U. S. 120 [24 L. Ed. 935]; Ives v. Hamilton, 92 U. S. 426, 431 [23 L. Ed. 494]; Morey v. Lockwood, 8 Wall. 230 [19 L. Ed. 339]; Elizabeth v. Pavement Company, 97 U. S. 126, 137 [24 L. Ed. 1000]; Sessions v. Romadka, 145 U. S. 29 [12 Sup. Ct. 799, 36 L. Ed. 609]; Hoyt v. Horne, 145 U. S. 302 [12 Sup. Ct. 922, 36 L. Ed. 713]. The converse is equally true. The patentee may bring the defendant within the letter of his claims, but if the latter has so far changed the principle of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted when he has done nothing in conflict with its spirit and intent. 'An infringement,' says Mr. Justice Grier in Burr v. Duryee, 1 Wall. 531, 572 [17 L. Ed. 650, 660, 661], 'involves substantial identity, whether that identity be described by the terms, "same principle," same "modus operandi," or any other. * * * The argument used to show infringement assumes that every combination of devices in a machine which is used to produce the same effect is necessarily an equivalent for any other combination used for the same purpose. This is a flagrant abuse of the term "equivalent." ' "

Without pursuing the comparison further, we conclude that neither of these five claims are infringed.

The eighteenth claim remains to be considered. It is not very clearly stated, but, taken as it should be, in connection with the specification, it would seem that it was intended to put into former constructions an additional set of price and value graduations. The scheme is, however, the same as in earlier patents, many of which, founded on the fundamental principle developed in the Flint patent, contained more than one set of graduations. In fact, the Flint patent itself disclosed more than one. So did the Pitrat patent of 1886, No. 344,857, which was, in another form, adopted in the Sanderson and Ozias patent. At most, this addition is but the mere extension of an old idea, and nothing more than the ordinary mechanical skill of one conversant with the art could readily supply. To admit patentability in this would be to hold that every duplication ad infinitum of similar forms founded on an old principle would be patentable invention. It is certain that such a proposition cannot be maintained. Smith v. Nichols, 21 Wall. 112, 22 L. Ed. 566; Grant v. Walter, 148 U. S. 547, 13 Sup. Ct. 699, 37 L. Ed. 552; L. Schreiber & Sons Co. v. Grimm, 72 Fed. 671, 19 C. C. A. 67; Soehner v. Favorite Stove Co., 84 Fed. 182, 28 C. C. A. 317.

The other patent of the appellee which is supposed to be infringed is the reissued patent to Mellinger, No. 11,738. The objects of the invention are stated by the patentee to be two: First, to secure a more perfect gravity adjustment for the beam, which cannot be tampered with by unskilled persons; and, secondly, to provide improved means for supporting the platform. The present suit is concerned only with the first of these objects. That part of Fig. 1 here shown illustrates the invention.

F contains the means whereby the gravity adjustment is effected. Fig. 2 shows one mode of effecting it.

In the specification it is said that in all scales, when the beam is balanced on its pivots, it must have its center of gravity slightly below its pivots, so as to have a small excess of weight below the pivots in order to give the beam the proper degree of sensitiveness and stability in its movements. And this is true of price as well as of weighing scales. The patentee, after commenting upon the difficulties which an inexperienced person would have in readjusting the gravity weight in case of any disarrangement, proposes to put it in a secure place where it shall be out of the way and not exposed to careless meddling after the adjustment has once been made by a competent expert. He therefore provided the cylindrical chamber, F, into the bottom of which cold lead is driven or melted lead is poured. Other soft metal may be used. Enough is introduced to effect the balance, and, if more happens to be put in, the excess may be bored out. This being done, a cap is to be screwed upon the top with pipe

tongs, and sealed so tightly that it cannot be removed by ordinary means. But the same result is reached, he says, by making the bottom part of the cylinder heavier and then boring out the excess of weight. All this is intended to be done at the factory. Another mode is provided for by making a metallic core for the chamber, which may be moved up and down by a set screw running down through its center and resting on the bottom of the chamber. The core is prevented from revolving by a screw running through the side of the chamber into a spline on the core. All is to be covered and sealed as in the other case. The patentee had, as we have said, pointed out that in all scales where the beam is balanced on pivots the center of gravity should be below the line of the pivots. And undoubtedly this was a well-known principle of construction, but it appears that he did not depend upon the relative height of the adjusting weight in the cylindrical chamber, for he says:

"Although I have shown in this particular instance the chamber or casing, F, arranged vertically and mounted upon one end of the beam, it is merely to perform the additional function of rigidly uniting the upper and lower graduated members of the beam, it being clear that the function of adjusting the gravity of the beam or lever with relation to its line of pivots will be equally performed if the casing or chamber, F, be arranged substantially parallel to and either above or below the line of pivots on said beam or lever."

He does not state how the center of gravity is in such case to be preserved at the proper place, and such a construction would seem to broaden his patent beyond his original conception, and far into the bounds of the prior art. The claims here relied on are the 1st, 2d, 4th, 9th, 10th, and 11th, as follows:

"(1) In a scale, the combination, with the beam, of a vertically arranged chamber or casing rigidly mounted thereon, and a gravity weight inclosed within said chamber, whereby the sensitiveness of the balance of the beam may be adjusted, and said beam is adapted to have its center of gravity varied vertically, substantially as described.

"(2) In a scale, the combination, with the balanced beam, of a casing having a chamber therein with its longitudinal axis at right angles to the longitudinal axis of the beam, with means for closing said chamber and a gravity weight carried by said beam and located in said chamber in fixed position, whereby the sensitiveness of the balance of the beam may be secured, but adapted to have its center of gravity varied vertically, substantially as described."

"(4) In a weighing and price scale, the combination with the weighing beam and independent price-beam, having its pivot adjustable with relation to the platform lever connection, of a chamber or casing on the price-beam, having its longitudinal axis at right angles to the longitudinal axis of the beam, and a gravity weight located in said chamber and adapted to have its center of gravity varied vertically, whereby the proportion of the weight below the pivot of the beam may be regulated and the sensitiveness of the balance of the beam adjusted, substantially as specified."

"(9) As an improved means for adjusting the gravity of scale beams or levers, a chamber carried rigid with the beam or lever and adapted to have more or less weight taken therefrom or placed therein and the center of gravity thereby varied vertically, and means for sealing the mouth of said chamber, whereby the sensitiveness of the balance of the beam may be adjusted, substantially as specified.

"(10) As an improved means for adjusting the gravity of scale-beams or levers, a chamber open at one end and carried rigid with the beam or lever, said chamber being adapted to contain weight more or less near its opening to vary its center of gravity vertically, and means for sealing the opening to

said chamber, whereby the sensitiveness of the balance of the beam may be adjusted, substantially as specified.

"(11) In a weighing and price scale, the combination with the weighing beam, and an independent price beam, having an adjustable weight-per-unit knife-edged connection between said price-beam and the platform lever connection, of a chamber open at one end, a gravity weight carried by said price-beam and located in said chamber, and adapted to have its center of gravity adjusted vertically with reference to said price-beam, whereby the gravity of the beam and the sensitiveness of its balance may be adjusted, and means for sealing the opening of said chamber and thus prevent tampering with the gravity of said beam, substantially as specified."

Various means for adjusting the gravity of scale-beams had long been in use, and it was only the provision of some new and useful means of effecting it which would entitle the device to a patent, and all old constructions or their equivalents belonged to their inventors or to the public. Without further reference to the progress of the scale-making art in this direction in earlier patents, we will glance at the patent to McNeill, No. 396,285, granted in 1889. This patent was for improvements in computing scales, one of which was in the means for adjusting the balance of the beam. The drawings show the price-beam and computing beam balanced on pivots in the usual way, and at their outer ends, integral therewith, a cylindrical chamber, or "bore," as it is termed, "which are adapted to receive suitable weights for balancing, such as shot, or the like." If, as we must suppose, the patentee knew, what was commonly known in the manufacture of scales, that the center of gravity should be in a line a little below the line of the pivots, we must presume that feature was embodied in his scale in providing for the adjustment. Observing this requirement, he makes the identical provision for containing the balancing weight as is found in the Mellinger patent into which McNeill says he puts "suitable weights," and a suitable weight would be any weight adapted to the purpose. It seems to us clear that this covered the general form of construction of the patent in suit, except that it did not show the screw cap sealed in to prevent intrusion, an element included in the combination of the ninth, tenth, and eleventh claims. The appellant, however, does not use this latter device, but an ordinary cap removable by simply lifting it.' If it was desirable to vary the vertical adjustment of the weight, that was easily practicable by raising the bottom of the bore with some other suitable material, or other means which would readily occur to a mechanic. The difference in this regard between the patent in suit and McNeill's is extremely slender. It is but "the shadow of a shade." So, if it was seen to be desirable that the weight should not have capacity to change its position laterally, an ordinary observer would know that the weight should conform to the bore. In regard to the form shown as a special illustration of Mellinger's balance weight, namely, a core raised and lowered in the chamber by a screw, it is enough to say that the appellant does not use it. Indeed, it is not shown that the appellant's structure contains anything more than that of the McNeill patent in this matter of adjusting the balance of the beam. In fine, we think that the 1st and 4th claims of this patent were anticipated by the McNeill patent, and that the 2d, 9th,

10th, and 11th claims are not infringed. The latter all include as an element of the combination the closed or sealed chamber which the patentee described as one of the distinguishing features of his invention, and this the appellant does not use. We do not pass upon the validity of those claims. Testimony was introduced by the appellant which it claims is to the effect that it does not make any adjustment itself, but makes and sells its scales with provision for such adjustment as the purchaser sees fit to make, and we are not referred to any evidence conflicting with this. Of course, if it made or sold scales having peculiar provision for the intended incorporation therein of a valid patented device of the appellee, it would be liable as a contributory, if the expected incorporation should thereafter be made by another. But if it makes or sells scales having simply adaptations for a proper adjustment, such as was known in the art, it would not be liable if another person should of his own volition put into the scales a form of adjustment patented by the appellee. But we need not decide this question of fact. Assuming for the present purpose that the Mellinger patent in some of the claims shows a patentable improvement of the McNeill invention, we do not find that the appellant makes use of such improvement.

We think it proper to say, in conclusion, that the history of these computing scales as exhibited by this record shows that the fundamental conception, as well as the invention of the principal mechanical elements of such scales, are justly attributable to the Flints. Their scale looks simple enough in the drawings, but it was the starting point in all the directions pursued in subsequent improvements, most of which relate to the merest matters of detail, though, taken all together, they have rendered the original invention more practical and useful.

The decree will be reversed, and the cause remanded with direction to dismiss the cross-bill at the cost of the appellee in this as well as in the Circuit Court.